Our postponed panel, Judge King and Jones, and I trust that the difficulties caused by the storm have been abated. We appreciate your cooperation in getting this case reset to be argued. So we're here on Riggs et al. v. Empire. Mr. Werner, you're up. May it please the Court if the Court would indulge me in a hypothetical in which the panel knocked and announced its entrance at 2 o'clock. I've been here since 1 o'clock. I was commanded by the Court to appear in person. We're not going to pay you extra. Well, between 1 – you all may not pay me extra. Between 1.30 and 1.45, I was commanded to be here. This is your strongest argument. You're in trouble. I hope that's not your strongest, but go ahead. Well, Your Honor, we're talking about engaged to wait. We're talking about the breakdown of how things work during the day. Even Empire would concede under that hypothetical that from 2 o'clock to 2.05 is compensable. That's Morelos v. Frio, straight up. It's at the appointed workbench, so to speak. We were here. We were waiting. There was a scheduled start time at 2 o'clock. It took five minutes. There was assuming compensability. If the workers took the early bus, 5 o'clock, as opposed to the late bus, then should the people who leave at 5 on the early bus get more money than the ones who took the last bus but who are still on time? I think that's a question for remand, Your Honor, just as the question of I was commanded to be here between 1.30 and 1.45. Well, I wasn't asking it as a serious question because I don't see compensability, but just taking your point of if you take the early bus at 5, I mean, the employer has a window of when you have to get there. So if you choose to take the early one at 5, your waiting time is longer than somebody who took the last bus. So in your argument, I mean, if compensable, then those persons should get more. I mean, isn't there a limit to compensability? There may well be on remand. Our position, though, Your Honor, is that remand is required because you're talking about the 5 o'clock bound. I'm talking about the 6.15 bound, and when we exclude the bus time because the Portal to Portal Act says that we have to exclude that bus time. That's what Griffin and the Portal to Portal Act say. They're still arriving at the lunch tent by 6.35, by everybody's agreement. They're getting there at 6.35. So we think that remand is appropriate because the lower bound is 6.35. Whether the people who arrived and got on the earlier buses might also be entitled to additional time I think is a question developed on remand. The record doesn't reflect, for instance, whether there were enough buses such that everybody could have arrived at 6.14 and 6.15 or whether as part of the business judgment they had set this time up so that the buses could be reused so that they would end up having to hire less buses so that they wouldn't have to have all of the buses ready at one time. The record simply doesn't reflect that. But, Your Honor, the remand would be required because the minimum would not be focused on the 5 o'clock arrivals but the 6.15 arrivals. Why? Because that was when they were required to be there. Well, that was the last bus, is that what you're saying? They had to be there, yes, Your Honor. The record is absolutely clear that if they arrived at 6.16, they could not work that day. They would not even be allowed if they went to the gates of the plant and asked to be let in. They would not be let in. They had to be there, sort of like Henry Ford said you can buy any color Model T you want as long as it's black. Empire says you can show up any time you want for your 7 o'clock shift as long as it's 6.15 or earlier. That's the engaged wait. Under Empire's reading, the 2 o'clock to 2.05 would be compensable. They agree, but they say that 1.30 to 2 o'clock or 1.45 to 2 o'clock is not compensable. There's no distinction. I was not able to use it. We spent 30 minutes, looked at the architecture, noticed the paint, talked about where we would go to dinner, things we needed to do to pass the time. Just like these gentlemen, they pass the time. Here they are. They're in an outdoor tent at 6 o'clock in the morning or 6.30 in the morning in January. Inside a plant gate, they can't go anywhere. They can't do anything, so they've got to do something. But that doesn't make it non-compensable. In Vega, it was very clear. The guys out in the field in Vega, they could have chit-chatted. They could have talked about what they wanted to do or talked about sports. They could have closed their eyes and taken a nap for 20 minutes while it was dark and waited for the light to come up and somebody to elbow them and say, okay, hey, it's about time to go out into the fields and start picking the chilies. And the Fifth Circuit said in Vega correctly that that was engaged-to-wait time. The employer had required them to be there well in excess, or I'll just say in excess, in advance of the time when the work was actually going to begin. The employer knew it. The employees didn't have any choice in it. They were there. They were classically engaged-to-wait. And Empire's only discussion about it is essentially to say Vega was wrongly decided. For the last 24 years, we haven't realized that Vega was wrongly decided. Two of the three of your honors were on the Griffin panel. Griffin cited Vega. So if Vega is bad law, it's news to, I think, everybody in this courtroom. Well, except for the fact that more recently the Supreme Court has decided the Busk case, right? That's correct, Your Honor. The Busk case talks about a post-liminary activity because the Portal-to-Portal Act excludes, takes two things very specifically. Preliminary and post-liminary. Well, first, the travel time, and second, preliminary and post-liminary activity. In Busk, that was an activity, and it was agreed by all that it was post-liminary to the work. They all had been working in the warehouse. There was going to be some sort of a security screening. This is not activity. It is waiting. Everyone agrees. In a refinery. It's not an activity any more than the guys out in the fields in Vega might if they're chit-chatting about sports. I mean, it's an activity. Sleeping is technically an activity. But it's not an activity in the way that the Portal-to-Portal Act looks at it. The Portal-to-Portal Act activity in Busk was the screening process. Well, go ahead. These guys aren't doing anything. And to the extent that they're physically doing anything, talking, it's completely unrelated to the job. Busk also says it has to be integral and indispensable to the principal activities. Respectfully, Your Honor, if it's eye-at-eye, integral and indispensable, then it's work. It's not engaged to wait. Again, the idea of engaged to wait is it's completely separate from work. And being engaged to wait accepts that it's not work. And it accepts that it's not integral and indispensable to work. But what we have here is it's also not, which distinguishes from Busk, it's not preliminary or post-liminary to any activity. They're just waiting. They're like the guys out in the fields in Morellas. They're like the people in Caro versus an integrated tech group that are told by the supervisors, allegedly, to arrive at the warehouse at 630 even though they can't enter until 7. They're like the employees in Margulies versus Tri-County. These are the district court cases where the employees are told you have to arrive two trains ahead of your scheduled train to wait for that train to do. There's no activity. They're just waiting. It's like even in IVP versus Alvarez, footnote 8 from the United States Supreme Court. As explained below, our analysis would be different if the employer required its employees to arrive at a particular time in order to begin waiting. There's no dispute that these people were, that the employees were required by the employer in the exercise of a business judgment. They say, and this is true, that this was ultimately sort of a plan that was concocted by a third party, but these are sophisticated business entities. Agreeing to somebody else's construct is a business judgment. So they have ownership of this busing scheme once they agree to get that job, bid for that job, take that job, and start it. So it becomes exactly like that. Why is this? If the employees, if this place were in the middle of Houston and the employees went to a park, said you have to show up at the lunch tent by 7 a.m., and just outside the gates of the watchman diggy was a park and ride that didn't open until, that opened, you know, 6.30, and everybody had to be there at 6.30 to get in, and it's not run by the company like these buses here. In practical effect, why wouldn't that be, would that be compensable too? It depends. If it truly took 30 minutes to get in as a screening type activity, let's say for security, then that would be a preliminary activity. That's like coming in and punching the clock. That's like when I come in and I have to get checked out by security. That's a preliminary activity. But the whole thing, it is an activity of massing the workforce, right? And they can't mass them all in one minute through the security gate to the lunch tent, and therefore they have to be coming in over a period of time. Otherwise the company would have to buy too many buses or whatever or have a conveyor belt or something. Well, if the company wants to make that business judgment, they can, but not on the backs of the employees losing the compensability of their time. That's the company's business judgment. You don't think they can use their cell phones profitably at 6.30 in the morning? One can use a cell phone, but again, in all of the other cases. I mean, that to me is just an extension of the commuting time. Well, Your Honor, respectfully, I think the Portal to Portal Act says what the commuting time is. But, you know, an exempt activity is walking, riding, or traveling to or from the actual place or performance of the activity. Well, the lunch tent is not where they perform the actual activity. That's just where that's like, you know, the front office. It's a holding bin, but no different, Your Honor. In Vega, if they had told them, well, guys, don't wait out in the fields. We need to go wait. We set up a little area around the oak tree over there. We wouldn't say, well, okay, well, now it's not compensable because the fields were over there. They're picking chili peppers over there, but they were told to sort of muster over here. That's all this. The lunch tent is just a mustering point, and the travel was over by the time they got there. That's even giving them the time off the bus to get from the bus to get to the lunch tent, if we assume that being sort of the corollary of what the court has said, that, you know, even if you show up at 630 at the parking lot, you still may have to park and walk across the street, or maybe you have to go show your badge. Yes, there are going to be a couple of minutes for that, but even subtracting, taking all of that out of the equation, taking out the travel, taking out whatever little bit it took to badge in. They actually badged in, in this case, before they got on the bus once they get to the tent. The tent is just a holding area. If we had taken that tent and put it out in the fields in Vega versus Gaspar, and the court said, well, the guys just have to go in that tent, surely that would not lead to a different result in Vega. Surely. I take it, though, that if we were to accept your argument that this is a huge refinery and so Empire isn't the only one with this problem. I mean, getting the number of employees that get into this refinery every day is a huge crowd. So this would apply not just to Empire, but it would increase the cost of all the people who are servicing that refinery. It would allow the employees to be compensated for their time. In Morales versus Frio, there were, I'm sure, good business reasons why they had to have the line start late sometimes or why they had to stop the line. Well, but then you still had to start. They were at their desks. I mean, that's not, or at their workstations. That's not the same thing as this case. But if they had told them, let's say, we're going to take for 25 minutes. We're going to go. We have to shut the machines down, so everybody go out to the tent. I got a little tent, a lunch tent set outside, and you all can have a 20-minute break, 25-minute break. That would be compensable. No question about it. And that's even setting aside the fact that it wouldn't be a true lunch break. They can't just sort of say, well, all right, we're going to, because we move you away from your workbench, your time is not compensable. But if you're over here, again, the easiest example for me is Vega. If they set up the lunch tent 200 yards away from the fields, would it be non-compensable if they're sitting at the tent, but it's compensable if they're sitting in the fields? I keep thinking about the impact of what it is you're asking us to do here. And when you think about that refinery and all the people who work there and the access roads around it, I mean, you're talking about a substantial increase in the cost of operating that refinery. It may be, but this is a substantially profitable refinery with a substantially profitable – Well, it is at the moment. Yes, I mean, this is a – these are business judgments, but ultimately these guys are the most prototypical Fair Labor Standards Act protectees, blue-collar workers who are working by the hour, who don't have any bargaining power except to do what it is that their employer tells them to do. Everybody that works in that refinery has to have a start time. They all have to show up at 7 o'clock. And so you're talking about a very large number of people, and the process of getting them in and out, in at the beginning and out at the end, is a complicated process just by virtue of the size of the refinery and where it's located and how you get there. So you're talking about every – potentially every contractor that works there, you're looking at a substantial increase. If they're in the busing scheme, and, of course, in all these refineries, if there is the time – if a mobile – Exxon Mobil Beaumont employee has to get to the gate at 6.53 and badge in and go through the gate and walk the, you know, 400 yards to get to his operating station, that is going to be a preliminary activity. Accepted, granted, but this is different. All the preliminary activities happen first, and then these guys are put on a wait. They're simply put in a bullpen, a holding gallery, sort of like in Walt Disney World. Well, they're not checking in, and they're free to do whatever they want to do. They can eat, smoke cigarettes, eat breakfast, talk to their girlfriends. The plaintiffs in Vega were free to do that. All right. Well, I think we have your opening salvo, Mr. Warner. Let's see what Bill has to say, and you've reserved your rebuttal time. Yes, sir. Thank you. Good afternoon. I'm going to start off by responding to something that Mr. Warner said about moving the tent outside of the field in Vega. The argument would be that in Vega, as was pointed out earlier, the employees were actually at their assigned fields. They were there working. The tent, the hypothetical tent that Mr. Warner identified, would be someplace away from their assigned field where everyone would congregate and, as pointed out a few minutes ago, could call their girlfriends or they could talk to each other. They could eat. At the tent at the refinery, it was not their workstation. It was quite a distance from their workstation, and as was pointed out a few minutes ago, one individual, one of the appellants, Mr. Bridges, did use a facility, a cornered-off facility, outside of the tent in order to smoke. He did what he wanted to do. Now, in addition, Mr. Warner indicated that he was here at an assigned time, and he had an assigned duty, and that was to sign in, to make himself known, to the clerk. Again, he was at his workstation, if you want to make that analogy. I think that BUSC is a continuation of the legislative history and the case law regarding following the Portal to Portal Act, and it's very interesting to look at Steiner because if you look at the appendix to that decision, it has the colloquy among several of the senators. In fact, there's one hypothetical given by, I think it was Senator Barclay, who said, well, what if I have a mechanic who shows up early at his workstation, and he decides, well, I'm going to sharpen my tools or do something like that. That, being at the workstation, doing something before the actual starting time, the argument was, and the other senator agreed, that that would be compensable time. Then that decision in 1956 was followed by several more. The Alvarez case, Johnson v. Regis, and the Morales case. Now, again, Morales was different, I think, from the current situation because those individuals were at their workstations. There was an assembly line at one point. We have, from the Fifth Circuit, the von Friewald case, and that one, I think, is very similar to the situation we have in front of you today because you saw that the various appellants were separated according to what they did. Some of them, during the time that they showed up at their workstations or at work early, they talked, they exchanged information with friends, coworkers, but only two of them, and in this case, out of 44 individuals who were on the complaint, there were only three who were at issue today. In the von Friede case, and that one, Mr. von Friewald, excuse me, did not win on appeal, but two other gentlemen did, both of them because when they arrived, one of them worked on his tools, another one had to finish up some of the tasks that had not been finished from the shift before them. So in that situation, as here, these three appellants did whatever they wanted to do in the tent. One of them did go from the tent to the work area, but as he said, I sat there and I chatted with colleagues, with coworkers. Now, as pointed out a few minutes ago, the individuals who had the opportunity to be able to decide which bus they were going to take, and some of the people, some of the original plaintiffs, did take that super early one, and Empire agrees, just because they took an early one, whether it was to assist them in their commute, because some of them were carpooling together, or whether there was one gentleman who said he was early bird, he liked to get up early, he liked to get someplace, but he also said once he got to the tent that he liked to just talk or read or something like that. So, again, you have to look at the, as Busk has pointed out, and so did Steiner, and so did the Portal to Portal Act, you have to look to see if the activity was integral part of the principal activity and indispensable, as Mr. Warner said, the I and I, to the principal activities. Well, what about vega? You've talked about everything except vega. Vega, there are two vegas. I'm talking about the first vega. The first vega did give some very strong direction on remand. For whatever reason, the lower court did not follow the instruction regarding that completely. Well, all I see here is, on the other hand, if the workers were on duty in the morning so as to get an early start for their employer's benefit, e.g. to assure that work would start promptly at sunrise, or because of Gasper's scheduling, the morning wait time is a compensable principal activity. But as Justice Thomas pointed out in the Busk decision, that if you have that situation where the test is, is it to the benefit of the employer, that is not the proper test. And, in fact, that was a unanimous decision, and I believe concurring decision written by Justice Sotomayor and was joined by Justice Kagan. So you're saying vega is the wrong test? Well, the benefit to the employer, it's a slippery slope. What is to the benefit of the employer? One could make the argument that wearing any PPE, whether it's the fire retardant clothing, the FRC, or if it's a hard hat or something like that is to the benefit of the employer. It keeps the employees safe. It reduces workers' comp. So exactly, you know, having that as a test, it's too overbroad, as Justice Thomas put in his decision. So I respectfully suggest that perhaps, that even though it didn't say we overrule the following decisions, perhaps BUSC did provide further guidance as to what the court may do in the future. What is the significance of the fact that the contract between Empire and I'm trying to think who the other party. Oh, the joint venture? Yeah. Right. Requires this BUSC. Well, even the first contract did. And it's basically Empire, and I agree that the other employers on the facility had to do the same thing. Yeah, everybody did it. Everybody did. Which is why this decision is important because it is a major, it would affect more than just Empire. It would. And not only at the refinery, but for other employers also has very broad significance. This is a common problem with refineries. And for other locations. I think that even if you went to an airport, you will see that a lot of the airport employees have to park quite far away, and then they get a shuttle bus to the airport. Again, is that because they're doing what they were told to do? Well, perhaps in the airport situation, the Homeland Security has some direction regarding that. But still, it's the same thing applied here at the refinery. Empire had to use the buses. Now, granted, there were some situations where some of the foremen were permitted to drive straight to the refinery gate and park over there, but the vast majority, we're talking thousands of employees, had to park remotely. Okay. So of the plaintiffs, I mean, I know there was a broader set of plaintiffs tweaking facts. Some slightly differentiated. Some claimed to be, you know, doing something. Correct. Others like these sort of acknowledged that they're just kind of there smoking, whatever, whatever. So how many, I know Mr. Bridges, but how many are left that are, you know, kind of at the center? There are only three in this appeal, Your Honor. All right. Right. Mr. Alanis, Mr. Bridges, Mr. Gonzalez. And the decision from Judge Crone was very specific, broke down just about every single plaintiff's responses to questions and depositions and that as to what they did, what they didn't do. And, you know, if there was an issue of material fact, those individuals are going to have their own trial. Now, these three are the three who really said, I got to the tent and I signed in, I went to smoke, maybe I talked with my colleagues, something like that. There was nothing that they did that was, that went towards the integrity, the indispensable activity. Scaffolding. Pardon? Scaffolding. Of scaffolding. Correct. What's the status of the other cases? Those right now are on hold. I'm sorry. To Judge Jones's question and sort of back to mine in terms of the three, assuming arguendo that the panel was of the view contrary to that argued by the appellant, what's the upshot of the narrows of which we would say in terms of the remaining cases? Or is it, you know, is there a potentiality depending on what our holding here is? I'm not saying what that is, but the others are kind of on hold, and I know they're slightly different facts, but. . . Well, they're very different facts, and I. . . So they're likely to not be affected by whatever we do. Is that a fair statement? I believe that's a fair statement, Your Honor. Okay. I'm sure Mr. Werner in his rebuttal can say something else, but I believe that there were enough issues of fact as to what were they doing in the tent during that time when they were not over in their unit at their workstations with the rest of their PPE and doing their work there. So they're pending but not necessarily on hold awaiting. . . No, no. . . Those are their acknowledged factual differentiations that have them stand on their own. Correct. And that's why that was not a class action, collective action. They're just everyone was very individual. Okay. So tell me again exactly how you distinguish Vega. Well, in fact, I keep distinguishing both of the Vegas that some of the activities that happened. . . Well, when you say both Vegas, we're not bound by whatever the district court did on remand. Right. So all I'm talking about is Judge Garwood's 1994 decision. Correct. And with respect to that, I believe that the holding there, as I mentioned earlier, involved individuals who were actually assigned while they were on the bus or as soon as they got off the bus to their particular fields to work in, the pepper fields. And so they were at their locations. There were questions as to some of the other activities that were going on, such as the. . . I think it was the post activities, post work activities, things like that. I'm not sure about that. Just the preliminary work. For those, they found that because they were there at their workstation, so to speak, they didn't use the word workstation, but they were there at the field that they were going to be working in. That was my understanding of what the holding was on that, Your Honor. So if we. . . Vega is there, and the Supreme Court's case doesn't expressly, as I recall, mention Vega or similar cases in terms of being overruled expressly. So what is your view on how we would hold in this case in light of Vega's existence on our books? I mean, it's still there. It hasn't been overruled by. . . It's still there, but I. . . You just say it's distinguishable on the facts. Is that your argument? On the facts, Your Honor, and going back to the tent, the people there were not at their workstations. They did not have all of their proper PPE. They did not, the ones that we're referring to right now, the three individuals, they had not worked on the JSA or the starts cards. They had not done those type of things. That happened once they got assigned, went to their appropriate unit, and met with their foreperson. So would a holding in this case, in your favor, be only good for those cases where it's uncontroverted, you know, of plaintiffs like this that don't even make a claim that they're, quote, doing anything? In other words, would every other case be fact-specific, like the ones pending, so that whatever we hold wouldn't really govern them? Do you follow what I'm asking? Or is it, you know, like these three, they don't make a claim. I mean, one's smoking, dah, dah, dah. So they don't make a claim that, well, I'm doing something that benefits you. It's integral, dah, dah, dah. They just say, hey, I'm there. You made me be there. Boom. So it rules. So just trying to figure how it cuts, assuming we were to hold that way, does that leave every other case, if somebody artfully pleads, if you will, or, you know, makes a claim of sorts, does it necessarily leave the district court with having to trial those just because they're the factual nuances? Do you understand? Yes, sir. And I think that the, and I may be mispronouncing the name, but the Ron Freewald case, that was after Vega. That had the type of situation where it was very fact-specific. And I think everyone who works in the area of the Fair Labor Standards Act will agree that you have to look at the specific facts. I mean, down to, you know, the title that a person is given for a job. The Department of Labor doesn't even look at that. They want to know, what does this person do? You can sprinkle all the pixie dust you want over your employees and give them any title that they want, but it's what do they do? And that's what they did in the Ron Freewald case. They looked at each of the individuals to see what they said that they did. And there were the two individuals. One was a mechanic, and the other individual was someone, may have been some sort of a mechanic also, who finished up the task from the previous shift. So that's the type I suggest to the court. That's the type of review that you have to do in these type of situations. Now, I see I have about a minute and a half. The one thing that I do want to really suggest to the court is that this idea that is stressed by the appellants, that you look at the predominant benefit, that is not followed. If you look at the Supreme Court decision, if you look at Ron Freewald, you will see that it's not that. It is, to use Mr. Warner's phrase, the eye in eye of the principal activity. What do they really do? Thank you. All right. Thank you. All right, Mr. Warner. You've got rebuttal. Thank you. Your Honor, the needle that they're trying to thread cannot be threaded. If I may make two comments. We've spoken about being away from the workbench or at the workbench for hypothetical purposes because I think there's a broader issue, but let's bear in mind, if that's where they want to go, this tent was a workbench. For the other 39 plaintiffs, if that be the answer, the reason summary judgment was denied is because work was done at the tent. They filled out cards. They discussed pre-safety analysis. They did job safety analysis. They're still in the case because work was done at the tent. That's going to be a real interesting case because if it varies from employee to employee, all of whom are scaffolders, about whether each one did work or not, that's a humongous thing to attempt to litigate. It's going to be very fact specific, just like Von Freeworld. You'll have some that performed actual work and some that didn't. But if that's their hook, the tent, I could take the position very easily that the tent is a workplace as well. But it doesn't have to be. They've made the argument that you can distinguish vega because they were out in the fields. And for the pre-time, they were out in the fields. But, Judge Jones, the post-daytime was also compensable as engaged-to-wait time. One can be engaged-to-wait. That had to do about with when they were getting paid. Yes. I'm not — that part of vega, it seems to me, is not relevant. Your Honor, they were — It's not relevant to the summary judgment record we have before us, which is that all these three fellows did not do anything for the employer. The workers waiting for their paychecks didn't do anything for their employer. They didn't do anything except wait. Well — They weren't in the fields anymore. But being paid is part of being employed, so — They simply weren't. Vega, both ends of vega, were engaged-to-wait compensations. Vegas, all it did, no, all it did was vacate and remand as to the pre-work time. It didn't — and it also uses principal benefit or something it doesn't use, integral and indispensable. But it does say that while they were out in the fields before sunrise, they were unable to use this wait time meaningfully for themselves because the fields were isolated and they lacked transportation. Yes, and in the next paragraph, Your Honor, it talks about the post-day time. I'm not — I'm just talking — we're just talking about the morning, so I don't see why the rest of it is relevant. An employer can engage somebody to wait after the day is over just as effectively and just as same as if they can engage somebody to wait before the day is over, before the day begins. In either case, they're engaged to wait. But the employees standing in line for a paycheck are standing in line for a paycheck. They are not talking on the phone and smoking cigarettes. At least they weren't back in 1994. They had a two-hour wait, Your Honor, from — there was a two-hour time period afterwards as referenced in the Fifth Circuit opinion. It took two hours for the employer to turn the records into the payer to receive a check to go into town to cash the check, then to come back and distribute the cash money to the guys who had been out at the fields but had been waiting two hours for this process to go on. In fact, the court in Vega very specifically and then on remand talked about how this was an artificially long and unnecessary pay scheme that these guys were having to wait for two hours because the employer didn't want to write them a check, because the employer wanted to go through this. The employer engaged these fellows to wait for two hours at the end of the shift. And what it says is re-remand for findings concerning the purpose. I'm talking about the afternoon wait, whether the wait served Gasper as a result of this burden, his burdensome pay system, and whether the workers could effectively use their time for their own purposes. Correct, and there may have to be a finding here on remand about whether the employees could use it. Well, the reason this went on summary judgment is that the employees, these three, said they did use it for their own purposes. The definition of being able to use for purposes, and it's security versus NALOR, which was a very recent decision, 2015, I think, from the Fifth Circuit, talked about how having a 30-minute lunch break where you can only use 18 minutes of it does not mean you can effectively use it for your own purposes. Sure, they could have spent that 18 minutes checking Facebook. They could have spent that 18 minutes doing whatever they want. I did not sit here for the whole time. I was able to go out and use the restroom. I could have taken a moment and checked Facebook. But this time that I spent waiting was not for my own purposes by any stretch of the imagination. Well, you're on a contingent fee, so your argument is totally irrelevant. Well, if I had with me, if I were a non-exempt employee, Your Honor, as these guys are. I see you're ending with the same strong argument you started with. Your Honor? That about waiting in the court. You know, we have to wait, too. We had to wait two months for this argument. I know you're trying to make a point, but I just doubt that one has much traction in terms of waiting in the courtroom. You've got a time certain, probably some more apt analogies. But at any event, that's probably a good place to put a period. We have you briefed, and we understand the significance of the case. While we worked with getting it argued, appreciate the briefing in it and the argument by both sides. We'll take the case under submission. We'll decide it and roll the opinion out. Thank you, Your Honor. Thank you both for your flexibility and scheduling.